# United States Court of Appeals
## For the First Circuit

No. 21-1071

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

Debtors.

_____

HON. PEDRO PIERLUISI, in his official capacity; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

Plaintiffs, Counterdefendants-Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,

Defendant, Counterplaintiff-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain, U.S. District Judge*]

Before

Thompson and Lipez, <u>Circuit Judges</u>,
and Torresen,** <u>District Judge</u>.

────────────

    <u>William J. Sushon</u>, with whom <u>John J. Rapisardi</u>, <u>Peter Friedman</u>, <u>O'Melveny & Myers LLP</u>, <u>Luis C. Marini-Biaggi</u>, <u>Carolina Velaz Rivero</u>, and <u>Marini Pietrantoni Muñiz LLC</u> were on brief, for appellants.

    <u>Mark David Harris</u>, with whom <u>Timothy W. Mungovan</u>, <u>John E. Roberts</u>, <u>Guy Brenner</u>, <u>Martin J. Bienenstock</u>, <u>Lucas Kowalczyk</u>, <u>Shiloh A. Rainwater</u>, and <u>Proskauer Rose LLP</u> were on brief, for appellee.

    <u>Jorge Martínez-Luciano</u>, with whom <u>Emil Rodríguez-Escudero</u>, and <u>M.L. & R.E. Law Firm</u> were on brief, for the Speaker of the Puerto Rico House of Representatives, the Hon. Rafael Hernández-Montañez, amicus curiae.

────────────

June 22, 2022

────────────

───────────────────────

\* Of the Southern District of New York, sitting by designation.

\*\* Of the District of Maine, sitting by designation.

**LIPEZ**, **Circuit Judge**.  In the legislation addressing the Commonwealth of Puerto Rico's fiscal crisis, Congress gave the Financial Oversight and Management Board for Puerto Rico ("the Oversight Board" or "the Board") authority to object to, and block the implementation of, local laws that are inconsistent with efforts to return the Commonwealth to fiscal solvency.  Appellants, the Governor of Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority (known as "AAFAF" based on its Spanish acronym), contend that the district court erred when it rejected their contention that the Oversight Board acted arbitrarily and capriciously in objecting to four laws duly enacted by Puerto Rico's legislature.  We disagree and therefore affirm.

**I.**

**A.  Legal Background**

In 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") to address the Commonwealth's fiscal crisis, facilitate restructuring of its public debt, ensure its future access to capital markets, and provide for its long-term economic stability.[1]  See 48 U.S.C.

---

[1] We have elsewhere provided a more comprehensive background on Puerto Rico's fiscal crisis and the enactment of PROMESA, including PROMESA's creation of a process for the Commonwealth to undergo bankruptcy proceedings.  See, e.g., Aurelius Inv., LLC v. Puerto Rico, 915 F.3d 838, 843-46 (1st Cir. 2019) (overruled on other grounds by Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC (In re Fin. Oversight & Mgmt. Bd. for P.R.), 140 S. Ct.

- 3 -

§ 2194(m)-(n). PROMESA established the Oversight Board, whose members are appointed by the President, with wide-ranging authority to oversee and direct many aspects of Puerto Rico's financial recovery efforts. See, e.g., id. §§ 2141-2147. Among its responsibilities is the certification of a fiscal plan and annual budget for the Commonwealth. Id. §§ 2141-2142. Of relevance to this appeal, PROMESA also provides the Oversight Board with the authority to review and ask the district court to enjoin the implementation of duly enacted Commonwealth legislation when the Oversight Board determines that the legislation does not comply with the approved fiscal plan or with PROMESA's statutory scheme to return Puerto Rico to fiscal solvency.[2]

Section 108(a)(2) of PROMESA, titled "Autonomy of Oversight Board," provides that "[n]either the Governor nor the Legislature [of the Commonwealth] may . . . enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes [of PROMESA], as determined by the Oversight Board." 48 U.S.C. § 2128(a). To that end, PROMESA outlines a multi-step, back-and-forth process by which the Oversight Board

---

1649 (2020)); Union De Trabajadores De La Industria Eléctrica Y Riego v. FOMB (In re FOMB), 7 F.4th 31, 35 (1st Cir. 2021).

[2] During the period relevant to this appeal, Puerto Rico was operating under an approved "2019 Fiscal Plan" covering a five-year period. The 2019 plan was subsequently replaced by a 2020 Fiscal Plan, covering the period through Fiscal Year 2025, which was certified by the Oversight Board in May 2020.

reviews Commonwealth legislation for consistency with the statute's goals.

Section 204(a) provides that "not later than 7 business days after [the Commonwealth] duly enacts any law during any fiscal year in which the Oversight Board is in operation, the Governor shall submit the law to the Oversight Board" along with (1) "[a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues"; and (2) a "certification of compliance or noncompliance" by that entity stating whether the law is "significantly inconsistent with the Fiscal Plan for the fiscal year". Id. § 2144(a)(1)-(2). The Oversight Board then notifies the Governor and the Legislature if a submission is problematic, either because it lacks a formal estimate or certification, or because the certification states that the law is significantly inconsistent with the fiscal plan. Id. § 2144(a)(3). The Oversight Board may direct the Commonwealth to provide the missing estimate or certification, or, if the Commonwealth has certified that the law is inconsistent with the fiscal plan, may direct the Commonwealth to "correct the law to eliminate the inconsistency" or "provide an explanation for the inconsistency that the Oversight Board finds reasonable and appropriate." Id. § 2144(a)(4)(B). If the Commonwealth "fails to comply with a direction given by the

Oversight Board," the Board "may take such actions as it considers necessary, consistent with [PROMESA], to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law."  Id. § 2144(a)(5).[3]

In addition to this general review process for duly enacted legislation, PROMESA also gives the Oversight Board the authority to review any request by the Governor to the Legislature "for the reprogramming of any amounts provided in a certified Budget."  Id. § 2144(c)(1).  The Governor must submit any such request to reallocate budgeted funds to the Oversight Board.  Id. The Board then reviews whether such request "is significantly inconsistent with the Budget."  Id.  The reprogramming cannot be adopted "until the Oversight Board has provided the Legislature with an analysis that certifies such reprogramming will not be inconsistent with the Fiscal Plan and Budget."  Id. § 2144(c)(2).

Last, but certainly not least, PROMESA authorizes the Board to "seek judicial enforcement of its authority to carry out its responsibilities."  Id. § 2124(k).

---

[3]  The Legislature may request that the Oversight Board "conduct a preliminary review of proposed legislation" before enactment, but "any such preliminary review shall not be binding on the Oversight Board in reviewing any law subsequently submitted."  48 U.S.C. § 2144(a)(6).

Although several of the provisions governing the Board's ability to review Commonwealth laws have not previously come before this court, the district court has authored several decisions that lay the groundwork for this appeal.[4]  In its <u>Law 29 I</u> decision, the court rejected the Commonwealth's argument that its "certification of lack of inconsistency [between a law and the fiscal plan] insulates a newly enacted law from scrutiny or challenge by the Oversight Board." <u>In re Fin. Oversight Mgmt. Bd. for P.R.</u>, 403 F. Supp. 3d 1, 12 (D.P.R. 2019) ("<u>Law 29 I</u>").  To the contrary, the court concluded, a certification by the Commonwealth is not "preclusive of inquiries [by the Board] as to its sufficiency or accuracy," and PROMESA "demands recognition of the Oversight Board's ability to question and, if necessary, bring before the [c]ourt challenges to the sufficiency and accuracy of documents as important as revenue estimates and certifications regarding significant inconsistencies with fiscal plans." <u>Id.</u> at 13-14.  The court further explained that a "formal estimate" under section 204(a) means a complete and accurate estimate "covering revenue and expenditure effects of new legislation" over the entire period of the fiscal plan. <u>Id.</u> at 13.  Simply submitting a dollar

---

[4] Pursuant to 48 U.S.C. § 2168, the Chief Justice of the United States has designated Judge Swain to preside over certain cases involving PROMESA's implementation, and the relevant district court decisions were authored by Judge Swain.

estimate "on official agency letterhead, no matter how conclusory or incomplete," does not suffice.  Id. at 12.

In its subsequent Law 29 II decision, the court held that Board determinations that Commonwealth laws impair or defeat the purposes of PROMESA are reviewed under the "arbitrary and capricious" standard typically used to review federal agency decisions.  In re Fin. Oversight & Mgmt. Bd. for P.R., 616 B.R. 238, 252-53 (D.P.R. 2020) ("Law 29 II").  While acknowledging that PROMESA specifically provides that the Oversight Board "shall not be considered to be . . . [an] agency . . . of the Federal Government," 48 U.S.C. § 2121(c)(2), the court noted that the Board's "powers and functions are similar to those of agencies charged by Congress with carrying out the provisions of statutes," Law 29 II, 616 B.R. at 252.  Under the "arbitrary and capricious" standard of review, the court "must decide whether the Oversight Board's determinations were supported by a rational basis and must affirm [its] decisions if they are 'reasoned[] and supported by substantial evidence in the record.'"  Law 29 II, 616 B.R. at 253 (quoting Trafalgar Cap. Assocs., Inc. v. Cuomo, 159 F.3d 21, 26 (1st Cir. 1998)).  Thus, the court held that the Oversight Board's determinations will only be set aside if they are "arbitrary, capricious, or manifestly contrary to the statute."  Id. at 254 (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)).

In <u>Law 29 II</u>, the district court also noted that PROMESA "allows the Oversight Board to prevent the application or enforcement of a law when the Commonwealth government fails to comply with a direction given by the Oversight Board pursuant to section 204(a)[]." <u>Id.</u> at 248. And the Board "is not required to prove to the [c]ourt that [a law] is significantly inconsistent with the fiscal plan" to demonstrate the Commonwealth's failure to comply with its obligations under section 204. <u>Id.</u>

The Commonwealth did not appeal either of the Law 29 decisions.

**B. Factual Background**

This appeal involves four Commonwealth laws that were passed by the Legislature and challenged by the Board.[5] Below, we describe these laws and the communications between the Commonwealth and the Board, pursuant to section 204(a), following their enactment.[6]

---

[5] A fifth law was before the district court but is not part of the present appeal.

[6] Pursuant to Executive Order 2019-057, the Puerto Rico Department of Treasury ("Treasury"), AAFAF, and the Puerto Rico Office of Management and Budget ("OMB") work together to prepare fiscal impact estimates and certifications for any enacted laws. For simplicity, we refer to the Governor, AAFAF, OMB, and Treasury collectively as "the Commonwealth."

### 1. Act 82 and Act 138

Because the communications regarding these two healthcare-related laws were intertwined, we discuss them together. Act 82, signed into law on July 30, 2019, creates a new regulatory scheme and establishes an "Office of the Regulatory Commissioner of Pharmacy Services and Benefit Managers" within the Puerto Rico Department of Health to regulate Pharmacy Benefit Managers ("PBMs") and Pharmacy Benefit Administrators ("PBAs"), entities that negotiate medication costs between pharmaceutical companies and third-party payers, including the Commonwealth. As the district court explained, "Act 82 changes the arrangements between [these entities] and pharmacies to require that pharmacies be reimbursed for at least their cost of acquisition of medications." The Commonwealth asserts that this change is necessary to allow pharmacies to recover their actual drug acquisition costs, ensuring that they continue to acquire necessary medications for the people of Puerto Rico.

Act 138, signed into law on August 1, 2019, amends the Insurance Code of Puerto Rico to (1) prohibit health care insurers from denying provider enrollment applications submitted by qualified health care professionals in Puerto Rico, and (2) prohibit Managed Care Organizations from unilaterally terminating or rescinding contracts with health care providers. The Commonwealth asserts that the law was enacted "to discourage the

- 10 -

mass exodus of health professionals [from Puerto Rico] and increase the availability of health care services throughout the Island."

The Commonwealth did not submit any section 204(a)-required materials on Act 82 within the statutory seven-day period. On September 12, 2019, more than a month after Act 138 was signed into law, the Commonwealth submitted to the Board a copy of the Act with a certificate reading as follows:

**Legislative Measure Number:**

- Act No. 138-2019 ("Act 138"), herein attached.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**

- Act 138 has no impact on expenditures or revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 138 is not significantly inconsistent with the New Fiscal Plan for Puerto Rico.

On November 15, 2019, the Board notified the Commonwealth by letter of several concerns it had regarding both Act 82 and Act 138: (1) it still had not received any materials regarding Act 82; (2) the copy of Act 138 and certificate had been submitted after the seven-business-day period mandated by statute; (3) the Commonwealth had failed to provide the required formal estimate for Act 138; and (4) both Acts may be preempted by federal law. The Board requested that the Commonwealth submit the missing materials, including, specifically, "a formal estimate of the

- 11 -

impact each Act will have on expenditures and revenues, including the impact on the government's medical insurance plan ('Vital')" and "an analysis of [the Acts] in relation to the corresponding federal statutes to ascertain there are no conflicting provisions that may jeopardize the grant of federal funds to the [Department of Health]." The Board noted that it "reserve[s] the right to take such actions as we consider necessary . . . including preventing the enforcement or application of" the Acts if it ultimately determines the Commonwealth has "failed to comply with our directive . . . or that [the] law[s] impair[] or defeat[] the purposes of PROMESA."

On November 18, 2019, more than three months after it was due, the Commonwealth submitted the following certification for Act 82:

**Legislative Measure Number:**

- Act No. 82-2019 ("Act 82"), herein attached.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**

- Act 82 has an approximate impact of $475,131.47 in the Department of Health's budget. However, Act 82 will be implemented using budgeted resources. If reprogramming of budgeted resources is needed, the appropriate agency will submit to the [Board] a formal request.
- Act 82 has no impact on revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- 12 -

- Act 82 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

A few days later, the Commonwealth responded to the Board's November 15 letter. The Commonwealth began by emphasizing its commitment to complying with section 204(a) of PROMESA, noting the then-Governor's recent Executive Order mandating compliance with that provision. However, the Commonwealth did not address the substance of the Board's concerns in its November 15 letter other than to vigorously contest the Board's ability to press the Commonwealth as to whether Acts 82 and 138 are preempted by federal law. In making its point that the consideration of possible federal preemption was outside the scope of the certification process, the Commonwealth insisted that

> Section 204(a)(3) only allows the Board to send notifications to the elected government under limited circumstances, specifically, if no certifications are sent or, if the Board understands an enacted law is significantly inconsistent with the certified fiscal plan.

In a December 18 response letter, the Board reiterated its concern that the Commonwealth was not complying with the section 204(a) requirements by failing to submit all required materials and submitting some materials after the seven-business-day deadline. The Board further asserted that the impact estimate for Act 82 was not sufficiently "formal" and was "not accurate" because "it provide[d] only an 'approximate impact' of the law on

- 13 -

the Department of Health's budget" and was "dramatically at odds with other authority on the subject; specifically, the Health Insurance Administration's recent testimony at [a] public hearing that [Act 82] would increase the Government's health plan budget by $27 million."  Regarding the preemption issue, the Board insisted that requiring a preemption analysis was consistent with section 204(a) because "if an enacted law negatively impacts the Commonwealth's budget because of conflicts with federal statutes, the law would not be consistent with the certified Fiscal Plan."

In a subsequent letter, the Commonwealth continued to assert that it had complied with its obligations under section 204(a) because it had "not received any notification [from the Board] that [the Acts] are significantly inconsistent with the Fiscal Plan."  The Commonwealth also maintained that the Board had no authority to either determine that the Acts are preempted by federal law or require the Commonwealth to consider whether they are so preempted.  Finally, the Commonwealth rejected the suggestion that Act 82's estimate was "not accurate" because it was "dramatically at odds" with the Health Insurance Administration's testimony at the public hearing.  Rather, it asserted, "any statement by an agency during the legislative process is subordinate to the determination of the appropriate government entities" -- AAFAF, OMB, and Treasury -- "in charge of issuing the [section 204(a)] certifications."

In a letter dated April 27, 2020, the Board stated that it had conducted its own analysis of the Acts because the Commonwealth had "so far failed to confirm that its analysis took into account germane factors pertaining to [the Acts] and their impact on federal funding." Based on its own analysis, the Board posed a series of detailed questions "regarding the financial assumptions on which the laws appear to be based." For example, for both Acts, the Board asked, "How will the potential impact from increases in PMPM [Per Member Per Month] rates be mitigated to maintain compliance with the Certified Commonwealth Fiscal Plan?"[7] The Board requested that the Commonwealth address its specific questions as part of formal estimates to be submitted no later than May 8, 2020. The Board further noted that "implementation of [the Acts] prior to satisfaction of the requirements of Section 204 would impair and defeat the purposes of PROMESA" and warned that it could take further action, including "seeking remedies for preventing" the Acts from being implemented.

The Commonwealth again responded that "no revised certifications are necessary" because, among other contentions,

---

[7] Generally, the PMPM rate is the "predetermined amount" that managed healthcare "plans are paid . . . per member per month [to] manage and pay for all services included in the benefit package." Bellin v. Zucker, 6 F.4th 463, 468 n.2 (2d Cir. 2021)(quoting Antonia C. Novello, N.Y. State Dep't of Health, New York State Management Long-Term Care, Interim Report to the Governor and Legislature at 20 (May 2003)).

section 204(a) requires only a "'good faith' effort to determine the financial effects of a new law" and the certifications "include[d] all of the required elements under section 204(a)(2) and were provided in good faith." The Commonwealth also asserted, despite its mention in the certification of possible reprogramming, that because Act 82 would be "implemented using budgeted resources," a formal request for reprogramming would not be required.

## 2. Act 176

Act 176, signed into law on December 16, 2019, amends the "Government of Puerto Rico Human Resources Administration and Transformation Act" and the "Fiscal Plan Compliance Act" to undo reductions in the accrual rates of vacation and sick days for public employees.[8] The Commonwealth asserts that the reductions in leave had "negatively affected the public employees who are entering the workforce because they have no time to spend with their loved ones which, in turn, affects their family life."

On December 26, 2019, the Commonwealth submitted to the Board a copy of Act 176 and the following certification:

**Legislative Measure Number:**

- Act No. 176-2019 ("Act 176"), herein attached.

---

[8] A prior law, Act 8-2017, reduced the accrual rates for certain public employees.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**

- Act 176 amends Act 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," and Act 26-2017, known as the "Fiscal Plan Compliance Act," in order to allow government employees to accrue 2.5 vacation days and 1.5 sick days per calendar month.
- The accrual caps for vacation and sick days remain at 60 and 90 days respectively. Additionally, Act 176 does not alter the prohibition established in Act 26-2017, with regard to the liquidation of vacation days accumulated in excess of the 60 days statutory limit.
- As prior to its enactment, government employees may only liquidate vacation days when there is a cessation from service. Act 176 does not allow public employees the liquidation of sick days.
- In addition, every governmental entity and instrumentality is required to formulate and manage a personnel vacation plan for each calendar year, which shall be strictly complied with by all employees, in order to ensure that said employees do not accumulate excess vacation days, while ensuring that the services provided by the corresponding governmental entities and instrumentalities are not interrupted.
- Consequently, insofar as Act 176 merely adjusts the accretion of vacation and sick days for public employees, but while strictly adhering to the liquidation prohibitions established in the 2019 New Fiscal Plan for Puerto Rico and Act 26-2017, we conclude that Act 176 has no impact on expenditures.
- Act 176 has no impact on revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 176 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

On May 11, 2020, the Board informed the Commonwealth that it had failed to submit the required formal estimate in that the certification "fails to account for Act 176's impact on employee productivity, given that it permits employees to take more vacation days during the year." The Board estimated that "if

- 17 -

full-time employees utilize all of the additional days Act 176 makes available to them (12-21 days depending on employee group), there could be a productivity loss of approximately five percent, which in Fiscal Year 2021 is akin to losing the full-time equivalent production of 2,400 public employees." The Board therefore directed the Commonwealth to submit a "complete formal estimate by May 19, 2020 taking lost productivity into account." The Board stated that "implementation of Act 176[] prior to satisfaction of the requirements of Section 204 would impair and defeat the purposes of PROMESA" and expressly "reserve[d] the right to take such actions as it considers necessary" including preventing Act 176's implementation.

A week later, the Commonwealth responded, vigorously defending the completeness of the submitted certification. Specifically, the Commonwealth disputed the need to "account for any speculative decrease in 'employee productivity'" because section 204(a) requires only an estimate of the impact on expenditures and revenues and the certificate "does exactly that." The Commonwealth went on to assert that the existing caps on the accrual and liquidation of vacation and sick days, and a requirement that every governmental entity create personnel plans to manage the use of vacation days, rendered the Board's employee productivity concerns illusory.

**3. Act 47**

Act 47, signed into law on April 26, 2020, amends the "Puerto Rico Incentives Code" to expand the scope of healthcare professionals who are eligible for incentive tax benefits. The Commonwealth asserts that Act 47's purpose is to encourage more medical professionals to enter practice and to stem the "flight" of healthcare professionals from Puerto Rico.

On May 4, 2020, the Commonwealth submitted to the Board the following certificate:

**Legislative Measure Number:**

- Act No. 47-2020 ("Act 47"), herein attached.
- Act 47 incorporates technical adjustments to Sections 1020.02(10), 2021.03(a) and 2023.02 of the Puerto Rico Incentives Code in order to provide tax incentives to more categories of health professionals. This legislation serves the public interest by promoting the retention of professionals in the health field[;] such a feat is particularly relevant in light of the COVID-19 pandemic.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues:**

- Act 47 has no impact on expenditures.
- Act 47 could have an estimated annual impact on revenues [of] $25.7 million dollars. However, said amount will depend [on]: (1) medical professionals that request tax incentives; (2) medical professionals ultimately approved to receive such incentives in light of the requisites; and (3) income ultimately reported by the qualified professionals. In other words, the impact provided by the Puerto Rico Department of the Treasury consists in an educated estimate that must [be] revised on an annual basis in order to provide an accurate impact on the revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 47 is not significantly inconsistent with the 2019 Fiscal Plan for Puerto Rico.

On May 21, 2020, the Board responded that the certificate lacked "even the barest specificity" regarding Act 47's fiscal impact. The Board took specific issue with the suggestion that Act 47's impact would be constant over the five-year term of the 2019 Fiscal Plan despite the Commonwealth's statement that the impact estimate "must [be] revised on an annual basis" due to the variables identified. The Board also challenged the Commonwealth's determination that Act 47 was not significantly inconsistent with the fiscal plan, opining that "it [is] difficult to understand how the Act, which the Government itself estimates will reduce revenue by tens of millions of dollars per year, without any corresponding cut in spending or proposal to increase revenues from other sources, can be anything other than significantly inconsistent with the certified Fiscal Plan." For these reasons, the Board requested that the Commonwealth submit a "complete formal estimate . . . identifying," among other key variables, "[m]inimum and maximum estimates of the percentage of medical practitioners applying for th[e] incentive."

On May 28, the Commonwealth submitted what it termed a "revised estimate," indicating that the Act could have a minimum annual cost of $540,000 and a maximum annual cost of $40.1 million (approximately $200 million over the period of the fiscal plan),

based on 7,188 potentially eligible medical professionals. The Commonwealth continued to maintain, however, that the Act was not significantly inconsistent with the fiscal plan given the plan's projected revenues of over $20 billion per fiscal year. That is, the Commonwealth asserted that even $40 million a year is, in the context of overall projected revenues, a relatively small amount and could not be a "significant" deviation from the fiscal plan. On June 5, the Board responded that the Commonwealth's submission "inappropriately minimizes the economic impact" of the Act and that "[v]iewing the costs of [the] Act [] in their proper context, meaning relative to the Commonwealth's own-source revenues, demonstrates that they are substantial." The Board concluded by warning that "[c]ontinuing to implement Act 47 as it is written, or proceeding to go forward with similarly significantly inconsistent legislation notwithstanding objections from the Oversight Board grounded in PROMESA, will lead the Oversight Board to have no choice but to seek judicial relief."

## C. Procedural Background

On June 12, 2020, the Commonwealth filed suit in federal court seeking, in relevant part, a declaratory judgment that, for each of the four laws in question, the Commonwealth had complied with section 204(a)'s formal estimate and fiscal plan compliance certification requirements. The Board subsequently filed counterclaims requesting injunctive relief barring the

implementation and enforcement of each law.[9] The Commonwealth moved for summary judgment on its claims related to Acts 138 (amending the health insurance code) and 176 (undoing reductions in vacation and sick days).[10] The Board filed cross-motions for summary judgment as to Acts 138 and 176, motions for summary

[9] Among its counterclaims, the Oversight Board sought "nullification" of each law. The district court eventually dismissed all claims for "nullification" because the Board "ha[d] not demonstrated that such drastic relief [was] warranted under the particular circumstances." 511 F. Supp. 3d at 128, 131, 133, 138. Neither side raises the "nullification" claims on appeal, and we do not address them further.

The Commonwealth also sought declarations that the Oversight Board cannot "unilaterally" invalidate a law and must seek judicial relief under § 2124(k) to enjoin a law's implementation. In other words, the Commonwealth sought declarations that the mere invocation by the Board of noncompliance with PROMESA did not have any legal effect in and of itself. The district court eventually dismissed these counts given the court's disposition of the Board's summary judgment motions. The Commonwealth does not address these dismissals on appeal. However, we note the district court's statement that "[a] proper declaration of a negative section 108(a)(2) determination by the Board [i.e., that a law would impair or defeat the purposes of PROMESA] triggers a statutory prohibition on action by the Government to go forward with the targeted statute, . . . but it does not empower the Oversight Board unilaterally to void the legislation or create an injunction." In re Fin. Oversight & Mgmt. Bd. for P.R., 511 F. Supp. 3d 90, 134 (D.P.R. 2020).

[10] After the Commonwealth's commencement of the legal proceedings, the Oversight Board inquired as to whether the Commonwealth had implemented any of the challenged Acts "notwithstanding the Oversight Board's instructions to the contrary pursuant to several provisions of PROMESA." The Commonwealth responded that the Acts had either been fully implemented, partially implemented, or it was the intention of the Commonwealth to implement them, despite the ongoing dispute with the Board.

judgment on the Commonwealth's claims as to Acts 82 (regulating pharmacy reimbursement for medications) and 47 (increasing tax incentives for medical professionals), and motions for summary judgment on its counterclaims. In its opposition to the Board's summary judgment motions regarding Acts 82 and 47, the Commonwealth requested an order deferring a ruling and allowing additional discovery pursuant to Federal Rule of Civil Procedure 56(d).

In its decision on the summary judgment motions, the court (1) reiterated its holding in Law 29 II that it would apply arbitrary and capricious review to the Board's determination under section 108(a)(2) that a law's implementation would impair or defeat the purposes of PROMESA; and (2) held that it would also apply arbitrary and capricious review to the Board's determinations under section 204(a) that the Commonwealth had failed to comply with its obligations to submit "formal estimates" and certifications. In so holding, the district court rejected the Commonwealth's invitation to apply a distinct "substantial evidence" standard under Puerto Rico law. The Commonwealth argued that such a standard should apply because of the Supreme Court's holding that the Board is an entity within the government of Puerto Rico. See Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC (In re Fin. Oversight & Mgmt. Bd. for P.R.), 140 S. Ct. 1649, 1659 (2020) ("Aurelius"). The district court, however, noted that "[t]he Aurelius decision was focused narrowly on the applicability

of the Appointments Clause and does not undermine this [c]ourt's prior reasoning about the level of deference properly afforded to the Oversight Board determinations on account of the Oversight Board's 'operational similarity' to a federal agency." In re Fin. Oversight & Mgmt. Bd. for P.R., 511 F. Supp. 3d 90, 121 (D.P.R. 2020) (quoting Law 29 II, 616 B.R. at 252).

Applying the "arbitrary and capricious" standard of review, the district court concluded that the Board's determinations regarding the Commonwealth's noncompliance with section 204(a), and its determinations that the challenged laws would impair or defeat PROMESA's purposes, were not "arbitrary and capricious." Regarding the Commonwealth's requests for discovery concerning Acts 82 and 47, the court stated that the Commonwealth had not "demonstrated that it lacks access to any evidence relating to any material fact that is necessary to oppose" the Board's motions. Id. at 127 n.22, 138 n.35. The court therefore enjoined the implementation and enforcement of all four laws, with a recognition that it could revisit such relief "if there emerge any significant changes in legal or factual conditions." Id. at 128 n.23, 131 n.28, 133 n.30, 138 n.36. The Commonwealth timely appealed.

## II.

We review a district court's grant of summary judgment de novo. López-Santos v. Metro. Sec. Servs., 967 F.3d 7, 11 (1st

- 24 -

Cir. 2020).  Summary judgment is appropriate if the record, construed in the light most favorable to the nonmovant, presents no genuine issue of material fact and demonstrates that the movant is entitled to judgment as a matter of law.  Id.; Fed. R. Civ. P. 56(a).  It is well-established that "[c]ross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require us to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'"  Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (quoting Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)).

Applying the "arbitrary and capricious" standard of review, the district court evaluated whether the Board's determinations were "reasoned[] and supported by substantial evidence in the record."  511 F. Supp. 3d at 120.  Although the Commonwealth now agrees on appeal that the "arbitrary and capricious" standard applies, it argues that this means more than just considering whether the Board's determinations were reasoned and supported by substantial record evidence.[11]  The Commonwealth

---

[11] Even in rejecting application of the Puerto Rico "substantial evidence" standard in favor of arbitrary and capricious review, the district court questioned whether there is "actually a difference between the two standards."  511 F. Supp. 3d at 121.  As the district court explained, "[t]he Puerto Rico 'substantial evidence' standard requires [such] 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. at 121-22 (quoting SPRINTCOM, Inc. v. P.R.

- 25 -

contends that "arbitrary and capricious" analysis must also consider attendant principles developed through decades of administrative law jurisprudence. Specifically, it contends that the Board (1) "must [have] explain[ed] the standard on which it bases its determination" (citing, inter alia, ACA Int'l v. FCC, 885 F.3d 687, 700 (D.C. Cir. 2018)) (2) "must have contemporaneously and reasonably explained its decision" (citing, inter alia, Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48-49 (1983)); and 3) may not rely on "hindsight rationalizations" (citing, inter alia, DHS v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1909 (2020)).

By contrast, the Board contends that even if we assess whether its determinations were "arbitrary and capricious," we should not apply "the entire apparatus of administrative law."[12]

---

Reguls. & Permits Admin., 553 F. Supp. 2d 87, 91-93 (D.P.R. 2008)). The court opined that this standard of adequate evidence "is appropriately considered as part of arbitrary and capricious review." Id. at 122.

[12] On appeal, for the first time, the Board argues in the alternative that we should apply a highly circumscribed "ultra vires" standard of review to its decisions. But the Board waived this argument by not raising it before the district court and by repeatedly asserting before that court that "arbitrary and capricious" review applied. See, e.g., 20-00080-LTS, Dkt. #16, 8-10 (Oct. 5, 2020); Bos. Redev. Auth. v. NPS, 838 F.3d 42, 47 (1st Cir. 2016) ("Having urged one standard of review in the district court, [a party] cannot now repudiate its earlier position and seek sanctuary in a different standard."). Moreover, raising a new standard of review for the first time on appeal, after the Commonwealth had already submitted its opening brief, does not reflect well on the Board and is inconsistent with the respect it

That is, the Board argues that "principles from federal administrative law that apply to agencies -- the rule that administrative agencies must offer contemporaneous reasons for their actions, the ban on hindsight rationalization, and the requirement to articulate consistent standards for their determinations" -- do not apply here because the Board is not a federal agency.

We see logic on both sides. On the one hand, PROMESA provides that the Oversight Board should be treated as an entity within the territorial government, not a federal agency, 48 U.S.C. § 2121(c)(1)-(2); territorial governments are expressly excluded from the definition of "agency" in the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(b)(1)(C); and the administrative law principles cited by the Commonwealth have developed through judicial review of "agency" action pursuant to the APA. Further, the Board is in many ways a unique entity, which has been given, by PROMESA's express language, a tremendous degree of authority over aspects of Puerto Rico's financial recovery.

On the other hand, core administrative law principles are not creatures of the APA. Rather, developed over time, these principles promote fairness and transparency in the administrative process and provide concrete guideposts for reviewing agency

should display in its interactions with the Commonwealth and the district court.

- 27 -

action.  See, e.g., SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (describing as a principle predating the APA's passage the "simple but fundamental rule of administrative law . . . that a reviewing court  . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency").  As the district court recognized, there is clear "operational similarity" between the Board and a federal agency.  In basic terms, both have been charged by Congress with using their statutory authority and organizational expertise to implement the terms of a complex statute.  It stands to reason that the principles used to review whether a federal agency decision is arbitrary or capricious could also be useful in evaluating a decision by the Board.

All that said, to decide this appeal, we need not settle to what extent the universe of federal administrative law should be applied in reviewing Board determinations.  We do think, however, that some guidance is warranted on one important issue -- the extent to which either the Board or the Commonwealth can support its position with rationales and analysis proffered for the first time during litigation.

The Commonwealth takes issue with the Board's submission during the litigation of declarations that, the Commonwealth claims, provided new justifications for the Board's determinations regarding the challenged laws.  The district court repeatedly cited two such declarations: one by Board Executive Director Natalie A.

Jaresko regarding all four laws, and another by independent health policy consultant Phillip Ellis stating his conclusion that Act 82 would increase healthcare costs for the Commonwealth. See, e.g., 511 F. Supp. 3d at 129-30 & nn.25-26. The Commonwealth contends that this reliance was improper.

"It is a 'foundational principle of administrative law' that judicial review of agency actions is limited to 'the grounds that the agency invoked when it took the action.'" Regents of the Univ. of Cal., 140 S. Ct. at 1907 (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015)). An agency may later "elaborate" on those grounds, but it "may not provide new ones." Id. at 1908. In other words, an agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation. See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971) ("The lower courts based their review on the litigation affidavits that were presented. These affidavits were merely 'post hoc' rationalizations, which have traditionally been found to be an inadequate basis for review." (internal citation omitted)); see also State Farm, 463 U.S. at 50; Regents of the Univ. of Cal., 140 S. Ct. at 1908-09.

There may be good reasons for applying these principles to the section 204(a) process. Requiring the Board to present to the Commonwealth all of its rationales for disapproving of a piece

of legislation enables the Commonwealth to fairly respond to the Board's stated concerns, or to address those concerns based on a fuller understanding of the Board's reasoning. This enhanced communication between the Commonwealth and the Board could conceivably reduce the need for litigation. If and when a dispute does go to court, a fully developed record enables the district court to properly assess whether the Board's determinations were supported by "substantial evidence" without considering post hoc rationalizations. See Regents of the Univ. of Cal., 140 S. Ct. at 1908-09.

However, given the unique nature of the section 204(a) process, and the relationship between the Commonwealth and the Board under PROMESA, a hard-and-fast rule that the Board never may proffer supplementary rationales or analysis during litigation would not be appropriate. This case illustrates one reason why this is so. By taking the Board to court soon after the two sides had reached an impasse, the Commonwealth short-circuited the process, particularly as to Acts 176 and 47, considering that the Commonwealth filed suit just weeks after first hearing from the Board regarding those laws. When one side cuts off the process in this way by going to court, it is only fair that the other side can further develop its position in the litigation.

Therefore, in proceedings arising from the section 204(a) review process, the district court should consider, on a

case-by-case basis, whether and to what extent it will allow either side to support its position with supplementary materials first proffered during litigation. In this case, with one exception discussed below, it is not clear that the materials submitted by the Board in the litigation contained anything more than elaboration of rationales the Board had provided in the pre-litigation correspondence. And this elaboration was certainly appropriate given that, as we have noted, the Commonwealth was the party that ended the correspondence by taking the Board to court. We thus conclude that the district court did not err in considering the supplementary materials submitted by the Board. We turn now to our de novo review of the district court's judgment as to each law.

## III.

### A. Act 82

Before the district court, the Board generally contended that the Commonwealth had failed to comply with the estimate and certification requirements of section 204(a) in regard to Act 82 and that the Act is "significantly inconsistent" with the fiscal plan. The district court ultimately ruled for the Board solely on the basis of the Commonwealth's failure to comply with section 204(a), holding that

> the undisputed factual record, when viewed in the light most favorable to the Governor, establishes that the Government failed to comply with its

statutory responsibility to provide a formal estimate and certification that was sufficiently informative and complete, such that the Oversight Board's determination of noncompliance and its ultimate decision to seek injunctive relief under section 204(a)(5) after repeated attempts to obtain a formal estimate and certification are neither arbitrary nor capricious. The only certificate of compliance and estimate submitted by the Government, which together comprise less than half a page of text, plainly fall short of even facial compliance with the formal estimate requirement; they provide no context or analysis to support the certification's assertion of consistency with the fiscal plan imposed by PROMESA § 204(a).

In re Fin. Oversight & Mgmt. Bd. for P.R., 511 F. Supp. 3d at 126. We agree.[13]

Despite the district court's prior explanation, in Law 29 I, that the formal estimate must cover the "revenue and expenditure effects of new legislation" over the entire period of the fiscal plan, 403 F. Supp. 3d at 13-14, the Commonwealth submitted a conclusory and unsupported estimate that did not even purport to account for the duration of the fiscal plan. As the district court accurately observed, the Commonwealth provided "absolutely no supporting rationale for the impact estimate of $475,131.47" and no "clearly articulated compound estimate that covers the entire duration of the 2019 Fiscal Plan." 511 F. Supp.

---

[13] In its analysis, the district court declined to consider the significance of the fact that the Commonwealth had submitted the certifications for Acts 82 and 138 well after the statutory seven-day deadline. We also decline to address these timeliness issues as they are unnecessary to our decision.

3d at 126. Nor did the Commonwealth take the "several opportunities" provided by the Board "to cure the perceived deficiencies and provide some sort of substantiation." Id. at 127. To the contrary, when the Board reasonably requested information about "the financial assumptions on which the law[] appear[s] to be based," pursuant to its authority under section 204(a)(4), the Commonwealth stonewalled. And then, having stonewalled, the Commonwealth cut off the exchange and took the Board to court. It was entirely reasonable for the Board to ask the court to enjoin implementation of the law, consistent with section 204(a), given that the Commonwealth had refused to comply with its obligations under that section.

On appeal, the Commonwealth emphasizes the Board's requests in the pre-litigation correspondence that it consider whether Act 82 would jeopardize the receipt of federal funds.[14] But the district court did not "reach whether the Board's request for such analysis was arbitrary and capricious . . . because the

---

[14] In its correspondence with the Board regarding Act 82, the Commonwealth repeatedly took issue with the Board's requests that it consider whether Act 82 would jeopardize the receipt of federal funds. The Oversight Board consistently maintained in its correspondence with the Commonwealth that it "was not asking for a preemption analysis" but rather "an analysis of the [Acts] to determine whether any provisions jeopardize the grant of federal funds to the Puerto Rico Department of Health." Because we need not consider the preemption issue, we do not determine whether this distinction drawn by the Board is a distinction with a difference for purposes of the statutory review process under section 204(a).

Government's section 204(a) noncompliance is already patent" from its refusal to respond to the Board's other questions about Act 82's fiscal impact. In re Fin. Oversight & Mgmt. Bd. for P.R., 511 F. Supp. 3d at 126 n.20. We again agree that it is unnecessary to consider whether the Commonwealth had to, as part of the "formal estimate," account for Act 82's impact on the receipt of federal funds. Even putting this request aside, the Board made reasonable requests for the Commonwealth to support its estimate and the Commonwealth plainly did not comply.

The Commonwealth attempts to rewrite the record by suggesting that the Board's entire objection to the estimate and certification was based on the federal funds issue and the Board's reference to "the Health Insurance Administration's recent testimony at [a] public hearing that [Act 82] would increase the Government's health plan budget by $27 million." While we acknowledge that the Board did repeatedly press the federal funds issue, a fair reading of the record demonstrates that the Board expressed a broader concern that the Commonwealth's conclusory "approximate impact" estimate was insufficiently supported. It is simply not evident from the record that the Board based its objections solely on the federal funds issue, or on the purportedly conflicting testimony.

Finally, the district court did not abuse its discretion in denying the Commonwealth's request to defer summary judgment

pending further discovery. See In re PHC, Inc. S'holder Litig., 762 F.3d 138, 142-43 (1st Cir. 2014) (explaining that we review the district court's denial of a Rule 56(d) motion for abuse of discretion). Other than a speculative suggestion that further discovery would have somehow undermined the Board's bases for questioning the Act's fiscal impact, the Commonwealth has not pointed to any type of information that would be germane to its claims and to which it did not already have access.

**B. Act 138**

As with Act 82, the district court ruled for the Board on the basis of its contention that the Commonwealth had failed to comply with its obligation under section 204(a). We again agree with the district court's analysis. For Act 138, the Commonwealth submitted a conclusory statement claiming "no impact on expenditures and revenues." The Board reasonably requested that the Commonwealth supply some analysis or data to back up that assertion, but the Commonwealth refused to do so. Again, the Board's determination that the conclusory and entirely unsubstantiated "no impact" statement did not constitute the required "formal estimate" was entirely reasonable. The Board was justified in directing the Commonwealth to address how the Act would impact expenditures and revenues. And it was justified in determining that, by not submitting a formal estimate or addressing

the Board's specific questions, the Commonwealth had failed to comply with its obligations under section 204(a).[15]

Finally, for the same reasons we expressed in relation to Act 82, we reject the Commonwealth's contention that the district court abused its discretion by proceeding to rule on the summary judgment motions without further discovery.[16]

## C. Act 176

The district court concluded that the Board had reasonably determined, pursuant to its authority under section 108(a)(2), that implementing Act 176 would "impair or defeat" PROMESA's purposes.[17]  In re Fin. Oversight & Mgmt. Bd. for P.R., 511 F. Supp. 3d at 133.  In so concluding, the district court

---

[15] Regarding Act 138 and Act 47, which is discussed further below, we are cognizant of Puerto Rico's important efforts to attract and retain doctors and other medical professionals.  We encourage the Commonwealth to focus on providing robust documentation regarding these efforts as it continues to develop incentives for medical professionals to practice on the island.

[16] We again need not address the "federal funds" issue because, setting that topic of inquiry aside, the Board's requests for more analysis by the Commonwealth were reasonable, and the Commonwealth's responses were patently noncompliant.

[17] Before the district court, the Board argued both that (1) the Commonwealth had failed to meet its obligations under section 204(a) to submit proper estimates and certifications for the four laws; and (2) the four laws in their substantive effect would "impair or defeat the purposes of" PROMESA.  The district court based its ruling on the first ground with respect to Acts 82 and 138 and, as explained below, on the second ground with respect to Acts 176 and 47.  On appeal, the Board does not raise the first ground as an alternative basis for affirming the district court as to Acts 176 and 47.

endorsed the Board's stated concern that the law would negatively affect expenditures through decreased worker productivity: "Common sense and basic principles of economics dictate that, by allowing sick days and vacation days to accrue more quickly, without reducing pay levels, Act 176 affects expenditures by increasing the price the Government pays for labor -- causing the Government to pay the same amount of money to each person for fewer days worked." Id. at 132. The district court further noted that the Commonwealth's recourse to the provision requiring each agency to institute plans governing their employees' taking of vacation days did not adequately address the Board's concern.

We agree with both points. The Board reasonably determined that Act 176 would decrease worker productivity -- resulting in the Commonwealth essentially paying higher labor costs to provide services -- and the Commonwealth did not refute this determination. It was thus reasonable for the Board to determine that the Act would impair implementation of the fiscal plan and PROMESA's purpose of securing the Commonwealth's fiscal solvency.[18]

---

[18] The Commonwealth urges us to determine the precise meaning of "significantly," as in when a law is "significantly inconsistent with the Fiscal Plan for the fiscal year". Id. § 2144(a)(1)-(2) (emphasis added). It contends that a law can only "impair or defeat the purposes of" PROMESA if it is "significantly inconsistent" with the fiscal plan, and that the purported inconsistency between the fiscal plan and Act 176 cannot be deemed "significant." We need not determine the precise meaning of

- 37 -

The district court also based its decision on the Board's contention that Act 176 conflicts with the fiscal plan's goal of "right-siz[ing] the workforce to the population size" and ensuring that agencies "deliver services in as efficient a manner as possible." Id. at 132. The Commonwealth contends that these rationales were never articulated by the Board during the pre-litigation correspondence. We agree that these rationales were first articulated during the litigation and were more than mere elaborations on the Board's stated concern about worker productivity. In the future in such a situation, the district court, mindful of traditional administrative law principles, should consider whether it is appropriate to accept a new rationale in support of the Board's position. Here, however, we are not troubled by the district court's consideration of the new rationales. As we have explained, although it would have been a better practice for the Board to have clearly articulated these rationales in its correspondence with the Commonwealth, it was not inappropriate for the Board to supplement its reasons for challenging the laws during the litigation, given the Commonwealth's abrupt termination of the section 204(a) process by taking the Board to court.

---

"significantly." Whatever its precise meaning, Act 176, with its sizable projected impacts on expenditures, can reasonably be deemed "significantly inconsistent" with the fiscal plan.

## D. Act 47

Lastly, the district court ruled in the Board's favor regarding Act 47, "[b]ased on [the Board's] determination that the loss of tens of millions of dollars" from the expansion of tax incentives "would defeat or impair PROMESA's purposes, which was communicated to the Government in the course of correspondence concerning section 204(a)."  Id. at 136.  The district court explained that "[t]he fact that Act 47 has the undisputed potential to reduce revenues by about $200 million over five years by creating tax incentives with no offsets to make it revenue neutral renders its implementation a flagrant and significant deviation from" the fiscal plan's principle of "revenue neutrality."  Id. at 137.  We again agree with the district court.  Simply put, it was reasonable for the Board to determine that a law that could reduce revenues by up to $200 million with no corresponding offsets would "impair or defeat the purposes of" PROMESA.

The Commonwealth makes much of the fact that, in its pre-litigation correspondence, the Board did not specifically cite section 14.3.3, the provision regarding "revenue neutrality" in the 2019 fiscal plan.[19]  But the Board expressly stated in its

---

[19] The principle of revenue neutrality for tax measures, which is also in the 2020 Fiscal Plan, see 2020 Fiscal Plan at 218, provides that "any tax reform or tax law initiatives that the Government undertakes must be revenue neutral, that is, all tax reductions must be accompanied by offsetting revenue measures of

letter regarding Act 47 that "it [is] difficult to understand how the Act, which the Government itself estimates will reduce revenue by tens of millions of dollars per year, without any corresponding cut in spending or proposal to increase revenues from other sources, can be anything other than significantly inconsistent with the certified Fiscal Plan." Given this description of revenue neutrality in all but name and the reference to the fiscal plan, we cannot conclude that the Commonwealth was unaware of the Board's revenue neutrality-based objection before the litigation. In other words, the revenue-neutrality issue was not truly raised for the first time during litigation and we are not troubled by the district court's consideration of this rationale.[20] We conclude, then, for the same reasons articulated by the district court, that the Board reasonably determined that Act 47 would "impair or defeat the purposes of" PROMESA.[21]

---

a sufficient amount identified in the enabling legislation," 2019 Fiscal Plan at 124.

[20] Because we think it plain that a law that reduces revenues by up to $200 million with no offsetting measures is "significantly inconsistent" with the fiscal plan and would "impair or defeat the purposes of" PROMESA, we need not, and do not, opine as to whether the Board could seek to enjoin any law that technically violates revenue neutrality, no matter how minimal the revenue reduction.

[21] The Commonwealth argues, in one paragraph of its brief, that the Oversight Board had a responsibility to "explain its change of position" because "[b]efore Act 47's passage, the Board's Municipal Affairs and Legislative Review Director had assured the Governor's Legislative Affairs Adviser that the Board had 'no issue' with Act 47." Even assuming this argument was preserved and is sufficiently developed before us, the Commonwealth has not

In summary, then, in the case of all four laws, we conclude that the Board did not act arbitrarily and capriciously in exercising its authority under PROMESA. To the contrary, the Board reasonably determined that the Commonwealth had either not met its obligations under section 204(a) to provide a "formal estimate" and certification (Acts 82 and 138), or that the laws would "impair or defeat the purposes of" PROMESA (Acts 176 and 47). The procedures and obligations contemplated by section 204(a) are not procedure for procedure's sake. Rather, they serve the critical purpose of allowing the Board to determine that the legislation at issue adheres to the fiscal plan and will not impair PROMESA's purpose of restoring Puerto Rico to fiscal stability. We therefore affirm the district court's judgment with respect to all four laws.[22]

---

demonstrated that this preliminary "assurance" from one official to another was sufficiently formal such that the Board's later position was indeed an "abrupt about face" meriting explanation. Cf. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (noting that an agency usually must provide some recognition of, and explanation for, a change in agency policy).

[22] The Commonwealth also argues that the Oversight Board violated a norm of administrative law by not "treating like cases alike" when it objected to Acts 82, 138, and 176. Even if we were to accept the application of this "norm" to the Board's actions, it is not clear to us that this argument was raised before the district court, and we would therefore deem it waived. To the extent the argument was preserved, it is fatally underdeveloped. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The

## IV.

Congress had to make difficult choices in writing PROMESA and responding to Puerto Rico's fiscal crisis. One of those choices was giving the Board the authority to review and block the implementation of laws enacted by the Puerto Rico legislature if they "impair or defeat the purposes of" PROMESA. We recognize the Commonwealth's objections to this unique structure. But that is the governing structure that applies here. The Board did not act "arbitrarily and capriciously" in exercising its authority under PROMESA.[23]

Affirmed. Each side to bear its own costs.

---

Commonwealth merely cites to several other certifications that were accepted by the Board and asserts that these "other laws had a demonstrated, non-speculative fiscal effect or their certificates included similar levels of analysis." Asking us to perform this context-less comparison is simply asking us to do too much in building the Commonwealth's argument. See id. (noting that counsel cannot "leav[e] the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").

[23] We are disheartened by the antipathy between the parties that was evident in the briefing and at oral argument. In the future, we hope that the Commonwealth and the Board will recommit to working together in a non-adversarial fashion so that this type of litigation can be avoided, in the best interests of the people of Puerto Rico.